Will you call the next case? Case number 317-0116, Terry Pommier, appellant by James Okasik v. Jungheinrich Lift Truck Corporation & Multiton Mic Corporation, at the leads by Scott Simpson. Is it Okasik or Okasik? Okasik. Okay, Mr. Okasik, fire when ready, except before you start your clock, in case you all weren't here for the last case, Justice McDade, unavoidably detained. She'll be listening to the oral arguments taking part in the case. Is that being said? I think so. I'm going to move on. May it please the court. Good morning, counsel. Good morning. This is a case where summary judgment was granted to a manufacturer, distributor, seller of a walkie, a floor jack, basically, that was electrically operated. It was manufactured in Germany, sold through a United States subsidiary, and was being used at the Millipore Corporation in Kankakee. It is, I think, critical that the court understand the operation of the parts here, and we have provided photographs and descriptions, but I'd like to just start off and say that if you look at what the physical layout is, it becomes very clear what has happened here, and the photographs document very clearly what has happened here. And when you think about it, the arm, the tiller arm, is connected at the base through a bolt that has what is called a cam on it. And this cam has two surfaces. It's kind of oblong in shape. One surface is intended to be down and in contact with what's called a roller switch. It's an electrical switch, rather small, actually, that has a plunger in it that goes up and down, which engages the circuit or disconnects the circuit. That is what applies to the brake. And when it is pushed down, and it's supposed to be whenever the tiller is down too far or up too far from the operating ring, that applies to brakes. So, theoretically, if the operator who is walking along with it, that's electrically powered, falls down and is still holding on to the handle, the handle goes down below a certain point, it will stop and not run them over. Conversely, if they let go of the handle, it's spring loaded, it's supposed to go all the way up, that will also apply to brakes. So it's a safety mechanism. The cam is designed with a flat surface so that when it rotates, when it's at either extreme, that will push the plunger down and engage the brakes. There is a surface on the other side as well. Now, this cam surface that we're talking about is on the lower part, and the switch is beneath it. The switch has a rubber roller that is on an axle, and as the cam moves, the rubber roller moves back and forth, pushes the plunger up and down. What we found when the machine was inspected was that the cam was upside down. Now, there is a similar surface on the other side. No one knows why, but this is the way the machine was manufactured. But that surface, rather than being totally level all the way across, it's like it's mounted on a flange, and behind it there is another raised part of the cam. Obviously, when it was installed, when it was designed, this surface was not supposed to come into play at all. And when it was installed upside down, this resulted in a strange operation of the switch. The roller part would not always contact the surface. What would happen is the flange part would catch the shoulder, the part where the axle attached at either end, it would catch the one side and push the plunger down. There would be no actual contact between the rubber roller and the cam surface, which is what was intended. When that happened, that changed where the brake engaged, at the lower end. This rubber roller would move back and forth, left to right, and change. Sometimes it would be in contact with the surface, sometimes it would not. The result of this was a difference in when the brake would engage at the lower level, depending on whether the roller was contacting the surface or whether the shoulder was contacting the flange. What this results in is erratic operation of the brake. And this had been the complaint of not only the plaintiff, but other employees who used this machine, that it would sometimes just brake when they were going along, suddenly, unexpectedly, and without warning. The reason for this is that as you were operating the machine and using it, it could move back and forth. So as you're going along, if the roller moved over, it would engage the brake and change. Carrie Pommier is a short woman, and as she would use the machine, she's more in the lower level than the upper level of where the brake would engage. So it would happen to her, and it happened to her several times. This particular time it happened, pulls her shoulder. She's pulling the load, she's walking, the machine stops suddenly, actually brakes, pulls her shoulder. So I would just like to say, first of all, are there any questions that the court has about how this switch and cam operate together? Great. In the court's consideration of the motion for summary judgment, there was a finding that this was a modification to the machine that absolved the manufacturer from liability. It is our contention that this was an incorrect ruling because this was not, under Illinois law, a modification of the machine that would absolve the manufacturer from liability. Not only was it not something that didn't modify the machine in the way that Illinois law has determined absolves the manufacturer, but it didn't substantially change the operation of the machine such that it was not foreseeable by the manufacturer that this could happen. They argue about the expert trained people who are supposed to be doing the work on this machine. Yet there are very many companies, just like with automobiles, that are not actually manufacturer's representatives who sell these machines and work on these machines. The machine was serviced by Calumet trained personnel. However, the technicalities of what was supposed to be done when the machine was serviced are nowhere in the record for this machine. These specificities are in the service manual. There has never been a service manual for this machine produced. The representative of Jungheinrich, who testified, got his information from a manual for a different machine, which was similar, but it was not the same machine. It was a different machine. And his other information, as he testified, he got by making a phone call to Germany and asking other people because he wasn't there at the time. He didn't have the records. No one has been able to find the records of the actual sale of this machine. So his opinions and conclusions are not exactly those which you would expect from some expert with a high degree of training and knowledge of what this is. You do know the date that the machine was manufactured? Yes, that record, the date of the actual manufacture, was in the records they had and the inspections. And this occurrence was 10 years later, in 2009? The occurrence was 10 years later. It was, again, the record was that the manufacture date was earlier in 2000, I mean in 1999. They have no record of when it was shipped from Germany to the United States and ultimately sold to, through Multiton, to, it wouldn't be to Millicorp, because Millicorp was a successor corporation to, it was the same place, but it was a successor corporation to the original buyer. And that machine was serviced three times before the occurrence? Does it matter when the cam got flipped? If it was flipped during the very first service, does that make a difference to your case? It does not, because our defect, which we allege, is a design defect, that if some service person somewhere before, and it doesn't matter what service person it was or when it was done before the accident, obviously from the record it was clear that that cam had been in both positions and had been used for what would seem to be an extended period of time in both positions. There were witness marks on both surfaces that indicated that the roller had been going back and forth on both surfaces for long enough to cause those witness marks. But because the cam was made and designed in such a way that, A, it had two surfaces, one was the one that was supposed to function, the other, we don't know what its purpose was, but it wasn't the one that was designed to function, it was just on a stud. If you loosen the nut, it could rotate very easily. And you don't have to actually take it off in order to rotate it. So whatever happened, because there are adjustments to be made, and clearly in the record there were requests from the corporation people that the handle and the tiller be adjusted in some way, shape, or form. There's also lubrication and maintenance performed down in that area. But it's very easily accessible. Eight screws, you take them off, the covers come off, and it's exposed. It's right there. I believe that there was a comment by the expert that you can't get a wrench on the nut in order to loosen it because they required a special tool when it was being manufactured. A, there's no evidence that this tool was available to service people to make sure that the cam was on properly, but just because, if you look at the picture, the wrench is slightly below it, and it's on an angle. And as most home repair guys know, you don't necessarily always get a great angle on the nut when you're doing it, but if you get a bite, you can move it back and forth. There's also other tools, wrench types, that can be used to do it, that a mechanic, a service person, could easily have available, as well as a corporation, which would be an offset box wrench where the handle is bent down and offsets from where the actual box has to go around the nut. There's also a socket and ratchet that could work. So, to get on that, let's talk about the law a little bit. Where's the manufacturer's liability? Well, they designed this machine with a cam that was critical to the safety and the operation of the machine. It was a safety device. It was critical that it be maintained in this position. There was nothing in the instructions, there was nothing in the service manual, because we don't have the service manual, but there's nothing on the machine itself either that identifies this or identifies the necessity of the alignment and that gives someone who's working on the machine a way of ascertaining the alignment. There's no mark, there's no sticker, nothing. And, if it was that critical, if it was that important to the safe operation of the machine, that it break when the handle was up or down, they also could have splined it, they could have combed and splined it in such a way so that it could only go on the one way. Well, would you agree that automobile brakes are critical to the operation, safe operation of the vehicle? Sure. And, if I know my brakes are maybe engaging a rat on their own, these new cars, it's... They work themselves. And, I know that's going on. And, I keep driving it knowing that. I call the dealer and say, this thing's not working right. Well, don't drive it. And, then I get in a crash. So, is that GMC's fault if I know my brakes aren't working right and I keep driving the car? It could be, yes. Because, if there was some defect there that the dealer was not fixing and recognizing and kept telling you it's okay to drive, then you may have a comparative negligence issue, but certainly a defect in the brakes that was causing that, that the dealer did not repair, would be cause for liability on the part of GM. Counsel, just two minutes. So, that's... I mean, the modification did not... It was something that would be foreseeable because the serviceman would be down there working. They knew it was critical. They didn't do anything. And, it was foreseeable for them that somebody would be there and they didn't do anything to make it safe. Well, isn't it safe if it stops running? To me, it seems like the fallback position of this piece of equipment was to stop. You'd have a different case if it went crazy and ran somebody over. But, you know, it's pretty safe. If the equipment isn't properly serviced, then it's not going to run. So, I don't see the connection here with the manufacturing defect. When it stops unexpectedly while you're using it in a... It's not an emergency situation. You haven't let go of the handle or anything like that. You're using it. And, the stopping point changes while you're using it. And, it was something that they complained about over time. They were told constantly it was either it was repaired or there was nothing they could do about it. And, the employer left the machine in service and the employees had no choice but to use it. Well, the employer had a choice. And, I assume there was probably a word of complaint out of this somewhere. Sure. The employer had a choice. He just took the choice to keep using the machine that people were telling him wasn't operating. Right. And, what would happen is they would say, it seems to be working fine. Because, when you would go use it and you knew what was going on, if you hold it up high enough, it's not going to come into play. You know, they couldn't recreate the condition. And, that's what made it so dangerous. It was inconsistent. You could be going along like the plaintiff was and it would stop suddenly without moving it up and down. Other times, you know, they don't have protractors. They don't know what the angles are supposed to be. The difference between 34 degrees and 15 degrees. You know, can you eyeball that? I mean, you know, maybe a good carpenter can. But, I know I wouldn't be able to tell the difference. And, it would look pretty much the same most of the time to the naked eye. But, there was no break in the chain of what caused, what practically caused this problem. They didn't design the can in a way that would ensure that it worked properly and it was able to be easily positioned so that it would not work properly. Thanks, Counselor. Thank you. Mr. Sensen?  Counsel, may it please the Court. I think one thing that cannot be overemphasized in this case is that this was a machine that went into the stream of commerce as safe. And, that's saying a lot as a manufacturer. As long as the owners, the operators of this machine read the manual, and the manual is kept on the machine, and the manual states that only qualified, experienced people can repair it, as long as that's followed, nobody gets injured. It's that simple. I have a Chevy, and I'm sure you... I'm sorry. I'm sure you could go into the engine compartment of my Chevy and manipulate thousands of parts. And, you know, these are universal parts because you have to have mechanics that can use universal screwdrivers and whatnot.  and mess the car up. And, the reason why GM is not liable is because they have manuals that say, don't do that. You have to have qualified people working on these machines. As long as somebody's qualified and working on this machine and using the service manual and getting the correct angles, nobody's going to get hurt. My brief ended up being into three sections. One was, there was two bases for summary judgment. One was, the court found that the machine had been modified after it left our control. The court also found that the plaintiff could not prove proximate cause. And the plaintiff also, in their brief, spent four or five pages talking about what it is to be a modified machine. And they were... They created this test, and it's not... They didn't do this at the trial court. This is new case law that they came up with. They argued that for a machine to be modified, and this is on page six of the reply, there's a three-part test. You must add or remove a part, it has to be an intervening cause, or you have to change the behavior of the operator. You can read all the case law on modification of products liability, and you're not going to find that in there. And I've read all the case law. What they did was, they said, to have a modification of a machine, you must add or remove a part. They then did a string cite to a bunch of cases in Illinois where that happened, and then concluded that you can only have a modification when you add or remove a part. What we have here is, the part wasn't added or removed. It was simply manipulated. It was turned upside down by somebody who we still don't know who did that. In response, I sent it to the Davis case, which was a garbage truck, where they did not add or remove parts. They simply manipulated the electronics, and the court said that could be a modification. So, and I also provided a hypothetical, again, where you go into a car and you flip the brake part around, whether or not that can qualify as a modification. Their response is that we should ignore hypotheticals. I would submit, if they're going to be advocating for a test that is not based on any law, that they should be able to address any type of hypotheticals. And I think it's clear that this was a modification. It altered the angle at which the brake would be engaged. So, clearly we have a modification here. The second part dealt with the court holding that this was modified after it left our control. Now, there's only three elements of products liability. One of the basic ones, and you can learn this in law school, is they have to prove the condition existed at the time it left the manufacturer. That's just basic products liability law. They can't do that because when it left our control, the cam was on the right way. The reason we know that is because there's witness marks. There's scratch marks from the roller that engaged the cam when it was right side up. So, we know that when it left our control, it was proper.  And the owner of the machine and the repair company have no records of any repairs. Now, sure, there was repairs going on. We just don't know what they were doing. Some were doing that 10 years when they were doing routine maintenance, annual maintenance. Somebody flipped this cam. And that's why we are here today. Now, the courts have carved out an exception when there is a modification. And they said, in those scenarios where it's objectively foreseeable that it could be modified, we're going to hold that responsibility to you. So, for example, if you have a punch press with some safety devices, and it's foreseeable that an operator is going to be, you know what, these things are in the way, and it slows me down, and it takes two little screws to pop it off, you know what, that's going to be on the manufacturer. And they created this test, and they said it is objectively foreseeable if it is easily modified by the operator. That is the test in Illinois. It's not if, and what plaintiffs did was they said, well, here's a design that would prevent this from being manipulated. And I would submit that that's not the standard in Illinois. You could make a car such that every single bolt and every single screw has to have a special tool, and you could make it such nothing could be manipulated, but that's not what the standard is for manufacturers. The standard is whether or not it would be easily modified by an operator. And one of the things that they looked at is whether or not expertise is needed to modify something. If you look at it, and I had to sit with our expert for a day to try to understand how the cam and the switch roller works and how it interacts with the handle, it's not something that's intuitive. I mean, there's some understanding of what the switch roller and the little, how it goes up and down and what the cam does. So there is some understanding of electronics and mechanics to do this. This is not something that an operator is going to be doing. They also look at whether or not you need special tools. Again, you have to have a wrench to take off this hood. So an operator who just shows up every day whose job it is to move, you know, pallets around, they would have to go and get a tool, remove this hood, and then start manipulating these internal cam and switch rollers. And as Council talked about earlier, the way that the cam is set up, that the wrench will only engage when it's, will only be tightened when it's in the right position, because if you have it upside down, the switch roller is in the way. And I think that was a design by a manufacturer is that the only way that a normal wrench will fit to tighten it is if the cam is in the right position. Finally, there's... What's the end result of the cam being in the wrong position? Does the machine operate faster, more often, or, I mean, what happened? Does it stop more often, or... Well, Council made a suggestion that it would act more erratically. If you read their expert report, he doesn't talk about that. That's not in the record anywhere. He simply is pointing to photographs that show a flange and whatnot. What the... Their expert examined the unit, and it's supposed to break. So the bottom, when you're holding this lever, the bottom is 15 degrees. When it goes up to 34, that's where it breaks. So what was the end result when the cam was split? Instead of going to 34, it now breaks at 25. So the break angle, according to their expert, it breaks from 15 to 25 as opposed to 15 to 34. So what it did was it actually expanded the operational area where it moves and it doesn't break. So what their expert actually found was that the machine was less likely to break. And if his whole theory is that this thing breaked in a way that it wasn't designed to, it'd break earlier or it'd break in a manner that it was not supposed to, it actually was the opposite. And it was kind of an epiphany. It was an epiphany that the defendants had at some point when we looked at their expert report and realized his findings actually supported our position. It actually made the operating area larger, and that gets to the third point where I talk about proximate cause. So we have this operator's manual, and the service manual is not important because that's not what the operator has access to. He has access or she has access to the operator's manual. And on page 7 of our brief, we cite all the provisions that say, operators, do not work on this, you can't work on this, only experienced service people. And, again, as long as the operator is not working on this, you know, there's no way this thing's going to be flipped. And this is what the trial court said on this. She said, there's nothing in the record that shows that dealing with the cam, that modifying, that pulling the cam off, reassembling, disassembling, and reassembling the handle is something that is ordinarily required for routine maintenance. I just don't have anything in the record. So the last issue is proximate cause, and this is where the court found that what the plaintiff testified to did not correlate to what their expert said happened here. She said that she was holding it above her waist, which doesn't tell us the angle, and she said she doesn't know how far the handle had to drop before the brake applied. Conversely, their expert, Pacheco, said that the lower braking range was now 15 to 25 as opposed to 15 to 34. There's just, in the last minute, I'd like the response to something that they alleged in the reply that they brought up for the first time. They said there was this Thomas Libeto who did an inspection and manipulated the machine five days after the accident before their expert made the findings about the angle. And what he found was that he did not do anything to the machine that changed any of the angles. They asked Libeto, is it adjustable, and this was his response. There's probably not much room. It probably would have maybe, because all of the little screws that hold the switch, so it's got two screws in it, so if you can get a sixteenth of an inch out of there, maybe a quarter inch on the whole of the handle. Question, okay, so it is hardly any adjustment at all. Answer, at all. Question, I mean, you cannot even get a degree out of it. Is that correct? Answer, correct. So Libeto does try to manipulate the machine a little bit five days after the accident, but he's saying what he ended up doing was not even changing it to a degree. So what we're left with is their expert who found the braking range, and again, this thing is affixed, so you're always going to get the same result on this machine because this thing is bolted on there. You're going to find that the lower braking range is 15 to 25 as opposed to 15 to 35, and their own expert cannot prove proximate cause as it relates to what she said was how she was holding the handle. Thank you very much. Mr. Ocasio. Mr. Ocasio, can I take some rebuttal? Thank you, John. First of all, if you read Mr. Libeto's testimony in the record, he does not, in his testimony, he is not describing the machine that happened here. He's talking about the actual switch being adjustable, and it is not adjustable. It's put in a fixed position. He did not remember anything about how this worked and how adjustments were made. When you look at his testimony about previously when he tried to change the settings, he talks about adjusting the switch, and if you read it, there's no comprehension there. He's not talking about the same machine. Maybe it's a different machine. Maybe he was misunderstood, but he didn't have pictures in front of him, and there was no congruence between his testimony and the machine actually set up. The machine did not go into the stream of commerce safe because it had a design defect. A design defect is a time bomb. It's not going to happen all the time. It's not going to happen the first time you use it. It's something that, because of the way you designed it, the bomb goes off further down the road without warning. So did your expert testify that in the condition it was in at the time of the accident that this thing would just break suddenly without any movement of the handle? No. He said that it would operate, well, it would operate inconsistently, that it could, the roller could move back and forth during the operation of the machine, which would change the actual point at which the brake would engage. Remember, when they talk about the braking range of 15 to 25 versus 15 to 34, that just means that the brake is on during that, in that angle. But once you get to 34 degrees, the brake stops. It stops. And if you keep going down, it's not like it stops more or, it's already been stopped. So sometimes it'll stop when you're here and sometimes it'll stop when you're there. And you never know until you actually encounter it where it's going to stop. And if you start it off and it stops here the first time, then you bring it up and you go further along and you go like that and it doesn't stop at the same place if that roller moves. And that's what Mr. Pacheco testified to in his affidavits. When they say qualified people should service it, it's not that having an unqualified person service it that creates liability. There has to be some change to the machine that so radically, not radically, but so substantially and materially changes the original design that the chain of proximate cause is broken. And an unqualified, untrained person can work on a car and do it right. But these were done by trained people. Could an operator, any operator, have fixed it? Sure. There were some fairly sophisticated service people there. They had a service department at Newport. They had wrenches and screwdrivers available. There were things that they had to do daily to the machine. So there were no special tools required to take the cover off and all you needed was a wrench. Now, obviously, someone was able to tighten that nut with a wrench when the cam was upside down. So that picture showing that the wrench doesn't, you know, the switch blocks, that's just staged. You can see that there's other angles that you could clearly get a wrench on there and tighten it. Somebody did it. So it's the ability to put the cam on upside down that you proper as a manufacturing defect? That design is a defect of the manufacturer that he's responsible for. Because somebody can put it together backwards? Well, it can rotate. They don't even have to take it off. You loosen that nut, turn it 180 degrees, tighten the nut again, and you're on the run-up surface. If you loosen the nut to do something else and you don't notice that it rotated 180 degrees and you tighten it back up because you think it's in the correct position, there's nothing on there that tells the serviceman that it's supposed to go the other way. There's no line of warning. So clearly, you know, with this inconsistent operation of the machine, there's an incentive for the operator to do it. There was no particular expertise required. The people at Millicore who were the operators. It doesn't have to be Carrie. It can be any person there that's operating the machine. The experts were able to do it. The experts serviced the machine many times. It was actually serviced three times after the Pointless accident, before it was taken out of service. So we really don't know. Three times before the accident as well? Three times before and three times afterwards. Before it was taken out of service. Again, we don't know exactly what was done each time because the way Labetta described it didn't jive with the actual setup. The machine was changed, but not in an unforeseeable way. Not in such a way that anybody noticed. The trained professional service people didn't notice the candles upside down. How can that be called a substantial modification that would break the chain of approximate cost between the employer and Carrie Connolly? I thought I heard you say earlier that both your client and other operators observed that the brakes weren't working correctly after the service. So operators knew that it wasn't right. Operators complained that it operated inconsistently. Service people were called in at least three times by Calumet before the accident to fix this problem. And every time they either said, I've done everything I could to try it, or they couldn't recreate the condition. But they never noticed the candles upside down. And they never noticed that there was supposed to be some other way to switch operators because they didn't have a service manual. Nobody knows where it is or what the service manual for this machine actually says. The operator's manual was not on the machine and available for the people. They had things they were supposed to do on a daily basis to inspect the machine, make sure it was charged. We ask that you rehearse. Thank you. All right. Thank you. And Mr. Simpson, thank you for your argument here today. This may all be taken under advisement. And as I indicated earlier, Judge McDade will be participating in the resolution of this matter. A written disposition will be issued. Right now the court will be in recess for a few minutes.